IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SHEILA SMITH,
    Plaintiff,

v.                              Civil No. 3:14cv143 (JAG)

CAROLYN W. COLVIN
Acting Commissioner of Social Security,
    Defendant.

## REPORT AND RECOMMENDATION

Sheila Smith ("Plaintiff") is thirty-nine years old, and she previously worked as a an assembler, as a certified nursing assistant, at AmeriCare Plus providing in-home care and as a cook/cashier. On September 3, 2010, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), claiming disability from sarcoidosis, irritable bowel syndrome ("IBS"), palpitations and diabetes, with an alleged onset date of March 15, 2011. The claims were denied both initially and upon reconsideration. On September 21, 2012, Plaintiff appeared before an Administrative Law Judge ("ALJ"), who denied Plaintiff's claims in a written decision on November 29, 2012. On February 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the Commissioner's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing Plaintiff's credibility. Defendant responds that the ALJ did not err and that substantial evidence supports the ALJ's decision. The parties have submitted cross-motions for summary judgment, which are now ripe for review.

Having reviewed the entire record in this case, the Court is now prepared to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motions for Summary Judgment or in the Alternative, Motions for Remand (ECF Nos. 13, 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision in determining Plaintiff's credibility, Plaintiff's education and work history, medical records, state agency physicians' opinions, Plaintiff's function reports, Plaintiff's testimony and Vocational Expert ("VE") testimony are summarized below.

### A. Education and Work History

Plaintiff finished school through the tenth grade. (R. at 230.) She additionally completed certified nursing assistant training. (R. at 230.) Plaintiff previously worked as an assembler, in a nursing home and as a cook/cashier at a restaurant. (R. at 230.)

### B. Medical Records

On February 16, 2011, Plaintiff went to Halifax Regional Hospital, complaining of back pain, abdominal pain, headaches and dizziness. (R. at 335-36.) Plaintiff was diagnosed with abdominal pain and prescribed pain medications. (R. at 340.) She returned several days later, again complaining of abdominal pain. (R. at 317.) Plaintiff's respirations were not labored and a CT scan showed no acute intra-abdominal abnormalities. (R. at 318, 334.)

On February 18, 2011, Plaintiff saw Johnna S. Thomas, M.D., complaining of sarcoid, palpitations, migraines and asthma. (R. at 385.) Plaintiff admitted to not taking her medications

2

as prescribed. (R. at 385.) Dr. Thomas restarted Plaintiff's medications and ordered an MRI of Plaintiff's abdomen. (R. at 385.) The MRI showed that Plaintiff had a right heptic lobe lesion and several splenic lesions, all of which were stable since August 2010. (R. at 316, 363, 401.)

On March 14, 2011, Plaintiff had a duodenal biopsy and gastric biopsy pathology report at Southern Gastroenterology Associates that showed only small bowel mucosa without significant histopathologic change, as well as mild chronic gastritis. (R. at 308, 486, 536.) She further underwent a colonoscopy that showed a polyp that was hyperelastic. (R. at 311-12, 398-400, 492-94, 538.) An esophangogastroduodemscopy revealed mild gastritis. (R. at 310, 403, 488-89, 540-41.) In April 2011, Plaintiff returned for treatment at Southern Gastroenterology Associates, and an x-ray of her abdomen came back negative. (R. at 483, 534.)

On March 18, 2011, Dr. Thomas performed a physical evaluation of Plaintiff that produced unremarkable results. (R. at 384.) Dr. Thomas advised Plaintiff to refrain from starting her anxiety medications until after her liver biopsy results. (R. at 384.) On April 21, 2011, Dr. Thomas diagnosed Plaintiff with Type II diabetes. (R. at 423.) An x-ray of Plaintiff's abdomen was negative. (R. at 427.) On May 25, 2011, Dr. Thomas advised Plaintiff to consult with her cardiologists regarding her complaints of heart palpitations. (R. at 422.) Dr. Thomas additionally indicated that Plaintiff could participate and work in classes and training for up to 20 hours each week. (R. at 422.)

On May 11, 2011, Plaintiff went to Halifax Heart Center and had a myocardial perfusion imaging with exercise stress. (R. at 409.) An echocardiogram report that day also showed a normal ejection fraction. (R. at 410-11.) In August 2011, Plaintiff's left heart catherterization produced normal results. (R. at 458-59, 502-03.)

In June 2011, Plaintiff returned to Halifax Regional Hospital, complaining of a migraine. (R. at 478.) A physical exam yielded normal results and a CT scan of her brain revealed no acute pathology. (R. at 478-80, 482.) Medication helped Plaintiff's migraine. (R. at 478-81.)

On July 1, 2011, Plaintiff saw Dr. Thomas for a check-up. (R. at 418-19.) Plaintiff complained of mood swings, difficulty sleeping and depression. (R. at 419.) Dr. Thomas indicated that Plaintiff was neither anxious nor depressed and that Plaintiff had normal cardiac, vascular, respiratory, neurological and gastrointestinal examinations. (R. at 419.) Additionally, Dr. Thomas noted that Plaintiff's diabetes was under control. (R. at 419.)

On July 25, 2011, Terrance Truitt, M.D. completed a polysomnography report that showed that Plaintiff had mild obstructive sleep apnea. (R. at 432-39, 476.) An August 2011 pulmonary function report showed minimal obstructive lung defect, as well as moderate restrictive lung defect and moderate decrease in diffusing capacity. (R. at 430-31.)

In July 2011, Plaintiff went to Clarkesville Counseling Center where she was diagnosed with non-specified depressive disorder. (R. at 443-51.) At that time, Plaintiff had not received mental health treatment for over fifteen years. (R. at 448-49.) The licensed counselor opined that Plaintiff was focused and oriented, and she had normal speech, appearance, and thought content and organization. (R. at 445-46, 450-51.) Plaintiff further only had a moderately depressed mood. (R. at 445-46, 450-51.) The counselor noted that Plaintiff had no deficits in memory, attention span, concentration, persistence or task completion. (R. at 445-46, 450-51.) Plaintiff had no psychosis. (R. at 445-46, 450-51.)

On August 23, 2011, Plaintiff weighed 199 pounds. (R. at 504.) On August 29, 2011, Plaintiff returned to Southern Gastroenterology Associates and an MRI of Plaintiff's abdomen showed a stable hepatic lesion, as well as multiple splenic lesions. (R. at 457, 533.) Arash

Chehrazi, M.D. opined that this suggested nonmalignant lesions. (R. at 457, 533.) Returning in February 2012, Plaintiff's x-rays showed no obstruction or perforation. (R. at 532.)

In January 2012, Plaintiff returned to Dr. Thomas, complaining of headaches. (R. at 566.) Plaintiff stated that she needed corrective eyewear and had run out of her migraine medicine. (R. at 566.) Dr. Thomas noted that Plaintiff was not anxious, depressed or irritable and that Plaintiff had normal cardiac, vascular, respiratory neurological and gastrointestinal examinations. (R. at 567.) The next month, Plaintiff's same tests remained unremarkable. (R. at 554-55, 576-77.) Further, wearing prescription eyewear improved Plaintiff's headaches. (R. at 554, 576.)

In February 2012, Plaintiff reported to Dr. Truitt that Plaintiff had not filled her prescription for her rescue inhaler and that she slept well with a CPAP. (R. at 513, 561.) Dr. Truitt advised that Plaintiff consider pulmonary rehabilitation and that she should increase her activity for weight loss. (R. at 516, 564.)

In April 2012, Plaintiff returned to Dr. Thomas, again complaining of migraines. (R. at 571.) Plaintiff continued to smoke and she drank excessive amounts of caffeine. (R. at 571.) At that time, Plaintiff weighed 211 pounds. (R. at 572.)

C. State Agency Physicians

On May 11, 2011, Leslie Montgomery, Ph.D. opined that Plaintiff had a medically-determinable impairment of anxiety-related disorder; however, Dr. Montgomery indicated that the impairment was non-severe. (R. at 89-90.) Linda Dougherty, Ph.D. affirmed Dr. Montgomery's determination. (R. at 108-09, 121-22.) On October 19, 2011, Joseph Cader, M.D. determined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours, as well as sit for six hours in an eight-hour workday. (R. at 110-

12, 123-24.) Further, Dr. Cader opined that Plaintiff needed to avoid concentrated exposure to odors, noise, fumes and poor ventilation, as well as hazards such as heights and machinery. (R. at 110-12, 123-24.)

D. Function Report

On April 23, 2011, Plaintiff completed a function report. (R. at 246-53.) She lived in an apartment with her two children. (R. at 246.) Her typical day entailed waking up, taking a bath, checking her blood sugar, eating breakfast and taking her medications. (R. at 246.) Plaintiff checked her blood sugar several times during the day. (R. at 246.) Plaintiff took care of her children by getting them up and readying them for school. (R. at 247.)

Plaintiff indicated that her condition left her unable to work a full-time job, because she had to go back and forth between the doctor and the hospital for tests. (R. at 247.) Her pain sometimes made it difficult to sleep through the night. (R. at 247.) Because Plaintiff became tired quickly, her condition affected her ability to dress, bathe and care for her hair. (R. at 247.) Further, she sometimes lacked an appetite. (R. at 247.) Plaintiff had no problem using the toilet. (R. at 247.) Plaintiff needed no special reminders to take care of her personal grooming or her medicine. (R. at 248.)

Plaintiff prepared her own meals, and she could make a sandwich, a frozen dinner or sometimes a complete meal. (R. at 248.) She prepared a sandwich or frozen dinner daily. (R. at 248.) Plaintiff vacuumed and washed dishes. (R. at 248.) She vacuumed for approximately one hour, once a week. (R. at 248.) Plaintiff reported not having the strength to do all of her household cleaning. (R. at 248.)

Plaintiff rarely went outside, because she did not feel like being bothered and because she hurt and was sick frequently. (R. at 249.) When she did go out, however, she rode in a car. (R.

6

at 249.) Although she did not own a car, she could drive and could go out alone. (R. at 249.) She would buy groceries at the store. (R. at 249.) Plaintiff could not pay the bills, because she had no income. (R. at 249.) Plaintiff reported, however, that she could count change, handle a savings account and use a checkbook or money order. (R. at 249.) Plaintiff stated that her ability to handle money had changed since the onset of her condition, because her condition prevented her from working. (R. at 250.)

Plaintiff's hobbies included watching television, which she did daily. (R. at 250.) She spoke on the phone weekly with family members. (R. at 250.) Plaintiff further reported that she did not go out on a regular basis, except to go to the doctor's office, and she did not need someone to accompany her when she went out. (R. at 250.) Plaintiff did not need reminders to go places. (R. at 250.)

Plaintiff indicated that she had problems getting along with others, because she did not want to be around anybody. (R. at 251.) Her condition affected her ability to stand, walk, kneel, climb stairs, complete tasks, concentrate and get along with others. (R. at 251.) Standing for too long made her legs and feet hurt, and walking wore her knees out. (R. at 251.) Further, she could not walk far at all before needing to rest for thirty minutes to an hour. (R. at 251.) Plaintiff could barely get back up if she kneeled. (R. at 251.)

Plaintiff reported that she could pay attention for approximately one hour before losing interest. (R. at 251.) Plaintiff did not finish what she started. (R. at 251.) She followed both written and spoken instructions well. (R. at 251.) Additionally, she got along well with authority figures, and Plaintiff had never been fired from a job because of problems getting along with others. (R. at 252.) Plaintiff did not handle stress or changes in routine well. (R. at 252.)

E. Plaintiff's Testimony

On September 21, 2012, Plaintiff, represented by counsel, testified at the hearing before the ALJ. (R. at 45-71.) Plaintiff was 37 years old and had worked as a certified nursing assistant until she stopped working because of her disability. (R. at 47-48.) Plaintiff had sarcoid, diabetes and migraines. (R. at 48.) Plaintiff also testified that she suffered from spots on her liver and spleen, as well as heart palpitations and depression. (R. at 48.) She was also bipolar. (R. at 48.)

Plaintiff's doctor prescribed treatments and medications that helped with Plaintiff's shortness of breath. (R. at 50.) Plaintiff testified that she did not have problems with her diabetes. (R. at 50.) She had migraines approximately every other day. (R. at 50.) The medication for her migraines made Plaintiff drowsy. (R. at 51.) Plaintiff received counseling and medication for her depression. (R. at 52.) She testified that she took her medication as prescribed and that she felt a lot better after taking her medications. (R. at 53.)

Plaintiff could do household chores, such as cooking and cleaning, but she had to take her time in doing them, because she would get tired. (R. at 55.) Activities such as sweeping or cleaning made Plaintiff short of breath. (R. at 56.) Plaintiff's mother helped Plaintiff with cooking, cleaning and laundry. (R. at 57-58.) Plaintiff could use a computer. (R. at 58.) She testified that although she did not own a car, she had a driver's license and drove herself to doctor's appointments. (R. at 57-58.)

Plaintiff testified that she weighed approximately 200 pounds, but her normal weight was about 160 to 170 pounds. (R. at 59.) Plaintiff's medication caused her to gain about twenty pounds in the last year. (R. at 60.) She testified that her doctors were not concerned about her weight. (R. at 60.) Plaintiff smoked cigarettes until a month before the date of the hearing. (R. at 70.) She had smoked since she was seventeen years old. (R. at 71.)

At the time of the hearing, Plaintiff lived in a one-story house with her mother and children. (R. at 61.) Plaintiff worked for AmeriCare Plus, providing in-home care before having to leave because of her condition. (R. at 62.) She had also worked in a factory, at a Dollar General store and at a convenience store. (R. at 64-66.) She also worked at Revlon unloading trucks and as an assembler. (R. at 67-68.)

F. Vocational Expert Testimony

During the September 21, 2011 hearing, a VE also testified. After reviewing Plaintiff's vocational history over the past 15 years, the VE testified that Plaintiff's job as a certified nursing assistant constituted light to heavy exertion work that was semi-skilled. (R. at 74-75.) Additionally, Plaintiff's work as a companion performing in-home care, as a fast food cook/cashier and as a convenience store worker all qualified as light, unskilled work. (R. at 75, 78.) Plaintiff's job as a production inspector constituted heavy and unskilled work. (R. at 77.) Finally, Plaintiff's work as a production worker/machine operator at Revlon was light to medium and unskilled work. (R. at 77.)

The VE testified that an individual with the RFC to perform light work with certain limitations such as avoiding concentrated exposure to workplace hazards such as moving machine parts, unprotected heights and respiratory irritants such as fumes, odors, dust, gasses, poor ventilation and noise could not perform Plaintiff's past work as a cook/cashier. (R. at 80.) That individual, however, could perform Plaintiff's past work as a companion. (R. at 80.) Approximately 50,000 positions existed in the national economy and approximately 1,188 positions existed in the local economy. (R. at 81.)

The VE further testified that, assuming an individual with the same age, education and work background as Plaintiff, an individual could do jobs that existed in significant numbers in

9

the local and national economies. (R. at 81.) That individual could perform the job of amusement attendant, with 63,000 jobs nationally and 1,300 jobs locally, as well as an information and records clerk, with 96,000 jobs nationally and 2,170 jobs locally. (R. at 81.) Further, that individual could perform work as a counter and rental clerk, with 110,000 jobs nationally and 3,100 jobs locally. (R. at 81-82.) All three of these jobs qualified as light and unskilled work. (R. at 82.)

## II. PROCEDURAL HISTORY

On April 4, 2011, Plaintiff protectively filed for DIB and SSI, alleging disability from sarcoidosis, palpitations, IBS and diabetes. (R. at 201-16.) Plaintiff's claim was denied both initially and upon reconsideration. (R. at 99-100, 127-28.) Plaintiff then requested an administrative hearing. (R. at 157-58.) On September 21, 2012, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 37-85.) On November 29, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled. (R. at 18-32.) On February 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## III. QUESTION PRESENTED

Did the ALJ err in assessing Plaintiff's credibility?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to her past relevant work[1] based on an assessment of the claimant's residual functional capacity ("RFC")[2] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the

---

[1] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[2] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

V. ANALYSIS

A. The ALJ's Decision

On September 12, 2012, the ALJ held a hearing during which Plaintiff, represented by counsel, testified. (R. at 45-71.) On November 29, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 15-32.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA since her alleged onset date of March 15, 2011. (R. at 20.) At step two, the ALJ determined that Plaintiff had the severe impairments of obesity and sarcoidosis with asthma. (R. at 21.) The ALJ further determined that the impairments or combination of impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) At step three, the ALJ determined that Plaintiff had the RFC to perform light work with the limitations that she avoid concentrated exposure to certain workplace hazards, respiratory irritants and noise. (R. at 23.) At step four, the ALJ found that Plaintiff could perform her past work as a companion, because Plaintiff's RFC did not preclude performance of work-related activities. (R. at 30.) Accordingly, because Plaintiff could perform her past relevant work, the ALJ found that Plaintiff was not disabled under the Act. (R. at 32.)

Plaintiff now challenges the ALJ's decision, arguing that the ALJ erred in diminishing Plaintiff's credibility and asks this Court to remand. (Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 15) at 12-15.) Defendant argues that substantial evidence

supports the ALJ's decision to diminish Plaintiff's credibility. (Def.'s Mot. for Summ. J. and Br. in Supp. ("Def.'s Mem.") (ECF No. 16) at 13-17.)

B. The ALJ did not err in determining Plaintiff's credibility.

Plaintiff argues that the ALJ erred in diminishing Plaintiff's credibility on the basis that Plaintiff had engaged in work-like activity in caring for her children and that the record did not substantiate Plaintiff's claim of twenty-pound weight gain over the previous year. (Pl.'s Mem. at 12-15.) Defendant counters that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 13-17.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant medical evidence in the record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take

into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 10011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some symptoms of the type alleged; however, Plaintiff's contentions as to the intensity, persistence and limiting effects were not credible in light of the record as a whole. (R. at 25.) The ALJ specifically diminished Plaintiff's credibility as being unsupported by her treatment record. (R. at 28-29.) The ALJ also diminished Plaintiff's credibility, because she engaged in work-like activity in caring for her children and the record

16

contradicted her claims of twenty-pound weight gain in the previous year. (R. at 29.) Substantial evidence supports the ALJ's determination.

Medical records support the ALJ's credibility determination as inconsistent with Plaintiff's treatment record. On February 21, 2011, providers at Halifax Regional Hospital noted that Plaintiff did not have labored respirations and a CT scan revealed no acute intra-abdominal abnormalities. (R. at 318, 334.) A February 2011 MRI revealed a right heptic lobe lesion and splenic lesions, but those lesions had all been stable since August 2010. (R. at 316, 363, 401.)

On March 18, 2011, Dr. Thomas's physical examination of Plaintiff yielded unremarkable results. (R. at 384.) In April 2011, an x-ray of Plaintiff's abdomen came back negative. (R. at 483, 534.) On May 25, 2011, Dr. Thomas indicated that Plaintiff could participate and work in classes and training for up to 20 hours each week. (R. at 422.) In June 2011, Plaintiff underwent a physical exam at Halifax Regional Hospital that showed normal results and a CT scan of her brain also revealed no acute pathology. (R. at 478-80, 482.) Further, medication improved Plaintiff's migraines. (R. at 478-81.)

On July 1, 2011, Dr. Thomas noted that Plaintiff had normal cardiac, vascular, respiratory, neurological and gastrointestinal examinations, and that Plaintiff was neither depressed nor anxious. (R. at 419.) In July 2011, the counselor at Clarkesville Counseling Center indicated that Plaintiff appeared focused and oriented and had normal speech, appearance and thought content and organization. (R. at 445-46, 450-51.) Plaintiff further had no memory, attention span or task completion deficits. (R. at 445-46, 450-51.)

In January 2012, Dr. Thomas noted that Plaintiff was not anxious, depressed or irritable. (R. at 567.) Plaintiff's cardiac, vascular, respiratory and neurological tests all showed normal

results. (R. at 567.) Those same tests were unremarkable a month later as well. (R. at 554-55, 576-77.) Further, prescription eyewear improved Plaintiff's migraines. (R. at 554, 576.)

Plaintiff's own statements also support the ALJ's decision to diminish Plaintiff's credibility. Plaintiff did not need assistance using the toilet. (R. at 247.) She further needed no special reminders to take her medicine or take care of personal grooming. (R. at 248.) She washed dishes and vacuumed. (R. at 248.) Plaintiff could also drive and go out alone. (R. at 249.) Plaintiff could count change, handle a savings account and use a checkbook. (R. at 249.)

Plaintiff could also pay attention for approximately one hour before losing interest. (R. at 251.) She followed written and spoken instructions very well. (R. at 251.) She got along well with authority figures, and Plaintiff had never left a job because of problems getting along with others. (R. at 252.)

Plaintiff testified that prescribed treatments helped with her shortness of breath. (R. at 50.) Her diabetes presented no problems. (R. at 50.) Plaintiff took her medications as prescribed, and she felt a lot better after taking them. (R. at 53.) Plaintiff testified that she could do household chores such as cooking and cleaning. (R. at 55.) Additionally, she could use a computer. (R. at 58.)

Plaintiff's statements further support the ALJ's determination to diminish Plaintiff's credibility, because Plaintiff had engaged in work-like activities akin to a childcare provider. Plaintiff took care of her children and readied them for school. (R. at 247.) Plaintiff additionally shopped for groceries. (R. at 249.) Plaintiff made full meals, as well as sandwiches or frozen dinners. (R. at 248.) Plaintiff could also vacuum and wash dishes. (R. at 248.)

Medical records provide additional support for the ALJ's determination that Plaintiff's statements regarding her twenty-pound weight gain in the previous year were unsubstantiated.

On September 12, 2012, Plaintiff testified that she weighed approximately 200 pounds and had gained approximately twenty pounds in the previous year. (R. at 59-60.) However, on August 23, 2011, records from the Halifax Heart Center recorded Plaintiff's weight as 199 pounds. (R. at 504.) Eight months later on April 27, 2012, Dr. Thomas's records reflected that Plaintiff weighed 211 pounds. (R. at 572.) Therefore, substantial evidence supports the ALJ's credibility determination.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motions for Summary Judgment or in the Alternative, Motions for Remand (ECF Nos. 13, 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                             /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: December 3, 2014